Shirley MITCHELL, Defendant–
Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 49S00–9803–CR–163.

Supreme Court of Indiana.

April 18, 2000.

Katherine A. Cornelius, Marion County Public Defenders Office, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Randi E. Froug, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

DICKSON, Justice

The defendant, Shirley Mitchell, was convicted of murder[1] and neglect of a dependent, a class B felony.[2] The victim was her granddaughter. For murder, the trial court ordered a sentence of sixty-five years but suspended five years. For neglect of a dependent, the trial court entered the conviction as a class D felony and sentenced the defendant to three years. The sentences were to be served concurrently.

On appeal, the defendant claims seven errors: (1) erroneous admission of hearsay testimony; (2) inappropriate comments by the trial court; (3) improper admission of autopsy photographs; (4) jury misconduct; (5) inconsistent jury verdicts; (6) improper and confusing instructions on lesser-included offenses; and (7) use of an inappropriate aggravating factor in sentencing. In its appellee's brief, the State also claims error, asserting that the trial court improperly modified the conviction for neglect of a dependent from a class B felony to a class D felony.

**Hearsay Evidence**

The defendant claims that the trial judge erred by allowing a social worker to testify regarding comments made by Aui-

---

1. IND.CODE § 35–42–1–1.

2. IND.CODE § 35–46–1–4.

nia, the murder victim's sister, during counseling sessions conducted after the victim's body was discovered. Auinia was nine years old when the counseling began and when she testified at trial.

On the evening of November 11, 1996,[3] the defendant repeatedly struck her six-year-old granddaughter, Emporia, with a two-foot-long wooden rod. Auinia, Emporia's older sister and also the defendant's granddaughter, was present and observed the beating. On the morning of November 12, 1996, the defendant woke Auinia and told her that Emporia was not breathing. Auinia observed as the defendant wrapped Emporia's body in a sheet and bedspread and hid it in a locked outdoor closet. The defendant told Auinia not to tell anyone about what happened to Emporia, saying that "it would be all [Auinia's] fault" and that the grandchildren would have to go to foster homes. Record at 663. Emporia's body was discovered by the authorities on December 11, 1996. On December 18, 1996, Auinia began receiving counseling from a social worker. During a counseling session on January 21, 1997, Auinia first told the social worker that the defendant told Emporia to "die, die" while the defendant was beating her. Record at 931.

The trial of the defendant began on October 14, 1997. On October 15, 1997, Auinia testified that, during the beating incident, the defendant told the victim to "die and different things like bad words and just telling her to die." Record at 658. To the question whether the defendant was saying this when she was hitting the victim with the stick, Auinia answered, "No." Record at 659. On cross-examination, defense counsel asked Auinia whether she had spoken with certain people about the beating, including the social worker, and Auinia indicated that she had. Defense counsel asked Auinia the following: "Now you also indicated—you also told [one of the prosecutors] that when your grandma was—was hitting Emporia that she was saying some bad things; right?"

Record at 680. After Auinia answered in the affirmative, defense counsel asked: "And then you told [that same prosecutor] that she—she said something about Emporia dying; right?" Record at 680. Auinia responded, "Yes." Record at 680. This was followed immediately by the following:

Defense Counsel: Now when Detective Hornbrook and Detective Buttram talked with you, you also told them that she said something. Do you remember that?

Witness: Yes.

Defense Counsel: Okay. And do you remember saying that she just said— that your grandma just said that she was going to whip Emporia until she told the truth?

Witness: No.

Record at 680. Shortly thereafter, the following questioning occurred:

Defense Counsel: Okay. And you have stated that—that she was—she was hurting Emporia.

Witness: Yes.

Defense Counsel: And that she was, at that time in the bedroom, that she was saying things to her.

Witness: Yes.

Defense Counsel: Okay. Now, do you recall telling Detective Buttram and Detective Hornbrook that your grandma said to Emporia at that time, I'm going to whip you and if you don't tell me the truth, you know, then it's going to be worse. Do you remember telling Detective Hornbrook and Detective Buttram that?

Witness. No.

Record at 683.

Later in the trial, when the State asked the social worker on direct examination whether Auinia had talked with the social worker specifically about what the defendant was saying while she was beating Emporia, the defendant objected to the

---

**3.** The defendant dates these incidents on or about November 6, 1996.

testimony as hearsay, arguing that the testimony did not satisfy the requirements of Indiana Evidence Rule 801(d)(1)(B). The defendant argued that, on cross-examination of Auinia, she had simply presented a statement that was inconsistent with what she had testified to and did not suggest that Auinia had falsified a statement or fabricated testimony. Regarding the admission of the social worker's testimony, defense counsel argued:

> Your Honor, we would note also that I never asked Auinia about that question [whether the defendant said "die, die"] on cross-examination at all. I never asked her. I never said isn't it true that [the defendant] never said that. I said—I never said to her, isn't it true that you did not make the statement to Detective Hornbrook. I never asked her, isn't it true that you didn't tell us this in the deposition. [The State] is absolutely wrong. All I did was present to the jury an additional statement that she had made or another statement that she had made. I did not make any follow up there that it was a statement that was in contrast with the die, die, die. I didn't touch it. Therefore, it clearly isn't at issue. It simply isn't.

Record at 928. The trial court remarked that "that's not my recollection, counsel," and indicated that defense counsel had made such "inferences" during cross-examination. Record at 928, 930.

The trial court overruled the defendant's objection and indicated that it would allow limited testimony by the social worker on this matter. The social worker then testified that Auinia told her that the defendant had said "die, die" to Emporia while she was beating her. Record at 931.

■ A ruling on the admissibility of an arguably hearsay statement is within the sound discretion of the trial court. *Horan v. State*, 682 N.E.2d 502, 511 (Ind. 1997) (citing *Jones v. State*, 655 N.E.2d 49, 56 (Ind.1995); *Taylor v. State*, 587 N.E.2d 1293, 1302 (Ind.1992)). We will reverse " 'only where the decision is clearly against

the logic and effect of the facts and circumstances.' " *Jackson v. State*, 697 N.E.2d 53, 54 (Ind.1998) (quoting *Joyner v. State*, 678 N.E.2d 386, 390 (Ind.1997)). Even if a trial court errs in admitting hearsay evidence, we will only reverse when the error is inconsistent with substantial justice. *Timberlake v. State*, 690 N.E.2d 243, 255 (Ind.1997). Thus, evidence improperly admitted under Indiana Evidence Rule 801(d)(1)(B) will not give rise to a new trial if its " 'probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.' " *Bouye v. State*, 699 N.E.2d 620, 626 (Ind.1998) (quoting *Brown v. State*, 671 N.E.2d 401, 408 (Ind.1996)). *See also* Ind. Evidence Rule 103(a); Ind. Trial Rule 61.

Although hearsay evidence is generally not admissible, Indiana Rule of Evidence 801(d)(1)(B) provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is ... consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose."

■ Challenging the trial court's ruling allowing the testimony, the defendant contends first that Auinia's prior statement was not consistent with her trial testimony. We disagree and find Auinia's prior statement sufficiently consistent with her trial testimony. In both statements, Auinia described the defendant, at approximately the same time, hitting Emporia and speaking about Emporia dying. Minor inconsistencies between trial testimony and prior statements do not necessarily render the prior statements inadmissible for purposes of Indiana Evidence Rule 801(d)(1)(B). *Brown*, 671 N.E.2d at 407.

■ The defendant also contends that her defense counsel neither challenged the

veracity of Auinia's testimony nor expressly or implicitly suggested that Auinia's testimony was a fabrication or that someone had improperly influenced the testimony. Because the defense cross-examination presented a prior statement and thereby suggested that Auinia had previously described the earlier incident without mentioning that the defendant told Emporia to die, we find that the defense implied that Auinia had fabricated her trial testimony.

■ Finally, the defendant challenges the trial court ruling by urging that the prior statement was made after the motive to fabricate would have arisen. The defendant contends that, if there was ever an improper motive on the part of Auinia, it would have existed prior to the statement she made to the social worker. The State responds that the defendant implied that Auinia fabricated her "die, die" testimony while preparing for trial and argues that Auinia made the statement to the social worker before any such motive for fabrication would have arisen. Because this is not an unreasonable interpretation of the record, we decline to find an abuse of discretion on the issue of whether the implied fabrication preceded the motive to fabricate.

We hold, therefore, that the trial court did not abuse its discretion in allowing the social worker to testify as to comments made by Auinia in January of 1997, nearly nine months before trial.

### Comments by the Trial Court

The defendant contends that she was denied a fair trial because the judge made inappropriate comments during the trial regarding the evidence. Specifically, the defendant argues that the judge improperly repeated and emphasized the most damaging portion of one witness's testimony, improperly asked another witness to speak up as that witness provided damaging testimony and later emphasized the credibility of that witness, and improperly emphasized the importance of comments the defendant made to a bystander after Emporia's body was discovered.

■ At trial, the defendant failed to object to these allegedly inappropriate comments by the judge. A failure to object at trial results in waiver of the issue on appeal. *Cf. Isaacs v. State*, 673 N.E.2d 757, 763 (Ind.1996) (a defendant waives possible error concerning the prosecutor's comments when he fails to object to the argument at trial); *Ware v. State*, 560 N.E.2d 536, 538 (Ind.Ct.App.1990) (the failure to include allegations of bias and prejudice on the part of the trial judge in the motion to correct error results in a waiver of the right to have this issue considered on appeal); *Lahrman v. State*, 465 N.E.2d 1162, 1168 (Ind.Ct.App.1984) (a prompt objection to a trial court's allegedly improper conduct is required to preserve the issue on appeal). The correct procedure to be employed when a judge makes an allegedly improper comment is to request an admonishment and, if further relief is desired, to move for a mistrial. *Isaacs*, 673 N.E.2d at 763. Failure to request an admonishment or move for a mistrial results in waiver of the issue. *Id.*

Seeking to avoid procedural default, the defendant, citing *Kennedy v. State*, 258 Ind. 211, 280 N.E.2d 611 (1972), and *Ware*, 560 N.E.2d 536, urges that this claim is not foreclosed because the judge's comments constitute fundamental error. We acknowledge that Indiana appellate courts have on rare occasions determined that the comments of a judge constituted fundamental error.[4] These cases do not, howev-

---

4. We have held that a trial before an impartial judge is an essential element of due process. *Timberlake*, 690 N.E.2d at 256 (citing *Abernathy v. State*, 524 N.E.2d 12, 13 (Ind. 1988)); *Harrington v. State*, 584 N.E.2d 558, 561 (Ind.1992). In *Kennedy v. State*, this Court refused to foreclose a defendant's claim of improper judicial intervention, even though the defendant had failed to object at trial, because "[a] fair trial by an impartial judge and jury is an essential element in due process." *Kennedy*, 258 Ind. at 218, 280 N.E.2d at 615. The Indiana Court of Appeals has considered the fundamental error doctrine in

er, establish as a rule that any improper comment by a trial judge will constitute fundamental error and thereby avoid the need for contemporaneous objection.

The fundamental error exception is extremely narrow. To qualify as fundamental error, "an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Willey v. State*, 712 N.E.2d 434, 444–45 (Ind.1999) (citations omitted). To be fundamental error, the error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Wilson v. State*, 514 N.E.2d 282, 284 (Ind. 1987). *See also Ford v. State*, 704 N.E.2d 457, 461 (Ind.1998) ("This Court views the fundamental error exception to the waiver rule as an extremely narrow one, available only 'when the record reveals clearly blatant violations of basic and elementary principles [of due process], and the harm

or potential for harm [can]not be denied.'") (quoting *Warriner v. State*, 435 N.E.2d 562, 563 (Ind.1982)). After reviewing the judge's comments, we decline to permit the defendant to avoid procedural default upon her claim of fundamental error. The judge's remarks merely required witnesses to speak audibly and asserted reasonable management of the proceedings.

## Admission of Photographs

The trial court admitted six autopsy photographs into evidence. The defendant contends that the trial court abused its discretion in admitting three of these photographs, State's exhibit numbers 19, 21, and 26, claiming that they were unfairly prejudicial.[5] The defendant claims that the primary effect of these photographs was to sway the emotions of the jury. At trial, the defense objected to the admission of these photographs, arguing that the

cases when a defendant claims improper judicial intervention, even when the defendant failed to object at trial. *See, e.g., Taylor v. State*, 602 N.E.2d 1056, 1059 (Ind.Ct.App. 1992) (regarding a trial judge's comments and questioning of a witness); *Ware*, 560 N.E.2d at 539 (regarding a trial judge's comments and interruptions); *Spaulding v. State*, 533 N.E.2d 597, 603 (Ind.Ct.App.1989) (regarding a trial judge's remarks allegedly impeaching or discrediting witness testimony); *Decker v. State*, 515 N.E.2d 1129, 1131–32 (Ind.Ct.App.1987) (regarding a trial judge's questioning of a witness).

5. The defendant also claims that the admission of the photographs resulted in the pathologist testifying about "fresh" injuries. The defendant argues that, from the use of these photographs, the jury was allowed to make impermissible inferences that some of the injuries in the picture were not fresh or that they were old or stale. The defendant notes that, pursuant to her motion in limine, the judge had ruled any reference to "old" injuries as inadmissible. The State contends that the defendant never objected at trial to this characterization of the injuries.

At trial, after the pathologist had been sworn to testify, defense counsel offered to stipulate the cause of death and expressed concern regarding the extent of the patholo-

gist's testimony and the nature of the photographs. Defense counsel argued that "there are indications in these photos of both old injuries and new injuries. The old injuries having previously been Limined out in the Motion in Limine." Record at 828. Defense counsel also explained that "the very fact that the jury is not going to be able to tell old injuries from new injuries in the photograph is what makes it crucial that we deal with this issue because they're going to assume that all injuries are due to this particular situation. And that's not the case." Record at 829. Defense counsel then requested that the defendant be allowed to advise the jury that the defendant was willing to stipulate the cause of death. The trial court admitted the photographs. Referring to State exhibit numbers 19 and 26, the pathologist testified as to "fresh" injuries depicted in the photographs and post-mortem changes to the body. However, the defendant did not specifically object to the characterization as the pathologist testified.

The defendant has waived this issue by failing to make a timely objection at trial to the pathologist's characterization of the evidence. *Harrison v. State*, 707 N.E.2d 767, 788 (Ind. 1999); *Stevens v. State*, 691 N.E.2d 412, 420 (Ind.1997); *Henderson v. State*, 544 N.E.2d 507, 510 (Ind.1989); *Frith v. State*, 452 N.E.2d 930, 931 (Ind.1983).

post-mortem changes to the body caused the photographs to be more prejudicial than probative, that one of the photographs was duplicative, and that injuries in one photograph did not appear as they did at the time of death, were not caused by the defendant, and thus would confuse the jury. The defense did not object to the admission of the three other photographs. The State responds that the pathologist testified that the photographs accurately represented the appearance of Emporia's body at the time of the autopsy, that the pathologist used the photographs to explain and illustrate the many injuries to various parts of Emporia's body, and that the pathologist explained that the post-mortem changes to her body had nothing to do with her injuries.

■■■■■ Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this Court reviews the admission of photographic evidence only for abuse of discretion. *Byers v. State,* 709 N.E.2d 1024, 1028 (Ind.1999); *Amburgey v. State,* 696 N.E.2d 44, 45 (Ind. 1998). Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403; *Byers,* 709 N.E.2d at 1028. "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally." *Amburgey,* 696 N.E.2d at 45. *See also Byers,* 709 N.E.2d at 1028. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value. *Spencer v. State,* 703 N.E.2d 1053, 1057 (Ind.1999); *Robinson v. State,* 693 N.E.2d 548, 553 (Ind.1998).

■■■■ The challenged photographs depicted various parts of Emporia's body from different angles, were relevant, had strong probative value, and served as interpretative aids for the jury in understanding the number and location of injuries inflicted upon Emporia's body. At least one photograph admitted without objection also depicted post-mortem changes to the body. We find that any potential for prejudice does not substantially outweigh the probative value of the photographs. Thus, we conclude that the trial court did not abuse its discretion by admitting the photographs.

### Jury Misconduct

The defendant also claims that the trial court erred in denying her motion to correct error, alleging that jury misconduct required a new trial. Based on an article that appeared in the *Indianapolis Star,* the defendant argued that the jury reached its verdict after conducting an impermissible experiment during deliberation in which the jury foreman allegedly beat the back of a leather chair fifty times with the two-foot-long wooden rod that had been introduced into evidence. The defendant urged that, by conducting this experiment, the jury improperly considered extrinsic evidence because the jury experiment constituted additional evidence supplementary to that introduced during the trial. The defendant claimed that she had a right to be present during this examination of the evidence. As relief for this alleged error, the defendant requested an evidentiary hearing to ascertain the existence, nature, and content of the alleged jury experiment and to present juror testimony and affidavits regarding the possible existence of extraneous influences upon the jury deliberations and a new trial.

In ruling on the defendant's motion to correct error, the trial court entered findings of fact and conclusions of law. The trial court found that an unverified allegation contained in a newspaper article alone is not sufficient to constitute newly discovered evidence. The court held that, even if the newspaper article is factual, the foreman's actions constituted permissible examination of the evidence and not an improper extra-judicial experiment. The trial court noted that the wooden rod had been admitted into evidence and that the

State, during closing argument, had conducted a similar examination with the rod and argued that the jury should imagine a child being hit similarly, up to fifty times. Finding no evidence of improper jury experimentation, the court concluded that the defendant had no right to be present during the jury's permissible examination of the evidence during its deliberation. The State contends that the jury properly examined intrinsic evidence, which had been introduced at trial, and thus that the trial court correctly determined that the jury did not consider additional or extrinsic evidence.

 In a motion to correct error, a party may address newly discovered material evidence, including alleged jury misconduct. T.R. 59(A). When reviewing a trial court's denial of a motion to correct error on newly discovered evidence, the standard of appellate review is deferential, and we will reverse only when the trial court has abused its discretion. *Francis v. State*, 544 N.E.2d 1385, 1388 (Ind.1989); *Moredock v. State*, 441 N.E.2d 1372, 1373 (Ind.1982). The burden is on the appellant to show that the newly discovered evidence meets the prerequisite for a new trial. *Francis*, 544 N.E.2d at 1388; *Reed v. State*, 479 N.E.2d 1248, 1252 (Ind.1985).

 We have repeatedly noted that, at common law, a verdict was not subject to impeachment by evidence from the jurors who returned it. *See Karlos v. State*, 476 N.E.2d 819, 824 (Ind.1985); *Fox v. State*, 457 N.E.2d 1088, 1092 (Ind.1984) (citing cases). Indiana's evidence rules incorporate this prohibition but permit exceptions in three instances:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

Evid. R. 606(b). In *Kennedy v. State*, 578 N.E.2d 633, 640–41 (Ind.1991), *cert. denied*, 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992), we held that the actions of two jurors, who were of height and build similar to the defendant, in trying on clothing introduced into evidence, constituted a permissible examination of the evidence and not an improper extra-judicial experiment.

 In this case, the trial court admitted into evidence the two-foot-long wooden rod used to beat Emporia. The pathologist testified that Emporia had suffered a minimum of fifty separate injuries to her head and body. Before closing argument, the defendant objected to the State using the rod to beat on a table or metal bar, and the trial court limited the State's use to striking only something soft. During closing argument, the State used the rod to strike a bag five times and directed the jury to consider Emporia being struck fifty times. The trial court, acting within its discretion, allowed the admitted exhibits to be taken with the jury into deliberation. The defendant did not object.

Even if we were to assume the accuracy of the newspaper article, an evidentiary hearing would not be necessary because such conduct is not improper. Thus, because such conduct would not constitute an extra-judicial experiment requiring reversal, the defendant's right to be present during all critical stages of trial was not violated. The trial court did not abuse its

discretion in denying the defendant's motion to correct error.

### Inconsistent and Unreliable Verdicts

The defendant contends that the jury's verdicts, finding the defendant guilty of murder and neglect of a dependent, are internally inconsistent and therefore unreliable. The defendant argues that, in finding the defendant guilty of neglect, "the jury found the failure to seek medical treatment caused Emporia's death and [the defendant's] negligence led to the need for medical treatment." Brief of Defendant–Appellant at 19. The defendant also argues that, in finding the defendant guilty of murder, "the jury found she knowingly killed Emporia and the beating, not the failure to seek medical treatment, caused her death." Brief of Defendant–Appellant at 19. The defendant frames her argument as follows: "Both of these propositions cannot be true. If [the defendant's] state of mind was merely one of negligence, she cannot be also guilty of Murder. If her state of mind was knowing, she was not negligent." Brief of Defendant–Appellant at 19. Thus, the defendant argues that the defendant could not have knowingly caused Emporia's death under the murder charge and negligently caused her death under the neglect charge.

▇▇▇ When this Court reviews a claim of inconsistent jury verdicts, we will take corrective action only when the verdicts are "extremely contradictory and irreconcilable." *Jones v. State,* 689 N.E.2d 722, 724 (Ind.1997). *See also Hodge v. State,* 688 N.E.2d 1246, 1248 (Ind.1997) (" 'Verdicts may be so extremely contradictory and irreconcilable as to require corrective action.' ") (quoting *Jackson v. State,* 540 N.E.2d 1232, 1234 (Ind.1989)); *Butler v. State,* 647 N.E.2d 631, 636 (Ind. 1995) ("[T]his court will 'review findings and verdicts to determine whether they are consistent; however, perfect logical consistency is not demanded and only extremely contradictory and irreconcilable verdicts warrant corrective action by this Court.' ") (quoting *Hoskins v. State,* 563 N.E.2d 571, 577 (Ind.1990)) (emphasis omitted). Furthermore, we will not attempt to interpret the thought process of the jury in arriving at its verdict, and perfect logical consistency is not required. *Jones,* 689 N.E.2d at 724; *Butler,* 647 N.E.2d at 636. *See also Hodge,* 688 N.E.2d at 1249 (" 'In resolving such a claim, the Court will not engage in speculation about the jury's thought processes or motivation.' ") (quoting *Jackson,* 540 N.E.2d at 1234).

▇▇▇ In this case, the State charged the defendant with knowingly killing Emporia Pirtle, by striking her with a wooden stick, thereby inflicting mortal injuries and causing her to die. To convict the defendant of murder, the jury had to find beyond a reasonable doubt that the defendant knowingly killed Emporia. IND.CODE § 35–42–1–1. To prove that the defendant acted knowingly, the State had to prove that the defendant was aware of a high probability that the conduct would result in death.[6] IND.CODE § 35–41–2–2(b) ("A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."); *Powers v. State,* 696 N.E.2d 865, 870 (Ind. 1998). *See also Brown v. State,* 703 N.E.2d 1010, 1021(Ind.1998) ("The trial court could reasonably determine that by inflicting over twenty wounds Brown acted 'knowing' that his actions could produce death."); *Horne v. State,* 445 N.E.2d 976, 979 (Ind.1983) ("[A]n act is done 'knowingly' or 'purposely' if it is willed, is the product of a conscious design, intent or plan that it be done, and is done with an awareness of the probable consequences."). In determining whether a defendant was

---

6. In the court's preliminary and final instructions to the jury, the court instructed that "[a] person engages in conduct 'knowingly' if, when he engages in this conduct, he is aware of a high probability that he is doing so. If a person is charged with knowingly causing a result by his conduct, he must have been aware of a high probability that his conduct would cause the result." Record at 349, 386, 632, 996.

aware of the high probability that her actions would result in the death of the victim, the duration, severity, and brutality of a defendant's actions, and the relative strengths and sizes of a defendant and a victim, may be considered. *Anderson v. State,* 681 N.E.2d 703, 708 (Ind.1997); *Gibson v. State,* 515 N.E.2d 492, 496–97 (Ind. 1987).

The State also charged the defendant with knowingly placing Emporia Pirtle in a situation that might endanger her life or health by failing to seek medical attention for her, which resulted in serious bodily injury and death. To convict the defendant of neglect of a dependent, the jury had to find beyond a reasonable doubt that the defendant, having the care of Emporia Pirtle, a dependent, by failing to seek medical attention, knowingly or intentionally[7] placed Emporia in a situation endangering her life or health. IND.CODE § 35–46–1–4(a). To convict the defendant of neglect as a class B felony, the jury had to find beyond a reasonable doubt that the neglect resulted in serious bodily injury.[8] *Id.*

Under the dependent neglect statute, the level of culpability required for knowing behavior "is that level where the accused must have been subjectively aware of a high probability that he placed the dependent in a dangerous situation." *Armour v. State,* 479 N.E.2d 1294, 1297 (Ind.1985) (applying IND.CODE § 35–41–2–2). Proof of this subjective awareness requires resort to inferential reasoning to ascertain the defendant's mental state. *Barrett v. State,* 675 N.E.2d 1112, 1116 (Ind.Ct.App.1996); *Kellogg v. State,* 636 N.E.2d 1262, 1265 (Ind.Ct.App.1994); *Hill v. State,* 535 N.E.2d 153, 154 (Ind.Ct.App. 1989). When there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the jury to infer that the defendant knowingly neglected the dependent.[9] *Hill,* 535 N.E.2d at 155. Also, in the context of care of a dependent, we have said that " '[n]eglect is the want of reasonable care—that is, the omission of such steps as a reasonable parent would take, such as are usually taken in the ordinary experience of mankind....' " *White v. State,* 547 N.E.2d 831, 836 (Ind.1989) (quoting *Eaglen v. State,* 249 Ind. 144, 150, 231 N.E.2d 147, 150 (1967)).

The evidence adduced at trial demonstrated the following. On Novem-

---

7. Under the statute, the state of mind required to commit the crime of neglect of a dependent is not negligence. Rather, a knowing or intentional state of mind is required.

8. The offense is a class D felony if no resulting serious bodily injury is proven. *Id.* The jury returned a verdict of guilty on the charge of class B felony neglect, and the trial court initially entered judgment convicting the defendant of class B felony neglect. However, the trial court later corrected its conviction and sentence for neglect, reducing the conviction to a class D felony because of double jeopardy considerations. *See infra* section discussing modification of the defendant's sentence.

9. Courts have held that, in those cases where a defendant has been found to possess the requisite subjective awareness, the circumstances demonstrated that the defendant had actual knowledge that a dangerous situation existed for the dependent. *See, e.g., White,*

547 N.E.2d at 836 (the defendant's knowing exposure of dependent to an environment of illegal drug use posed danger to the dependent); *Kellogg,* 636 N.E.2d at 1266 (because the defendant had actual knowledge that he had consumed a substantial quantity of alcohol and that his child was a passenger in his vehicle, the jury could have reasonably inferred that the defendant had actual knowledge that a dangerous situation existed); *Sample v. State,* 601 N.E.2d 457, 459 (Ind.Ct. App.1992) (because the defendant had actual knowledge of a "bump" on child's head which was later discovered to be a skull fracture, the jury could infer that the defendant was aware she placed child in danger by failing to obtain prompt medical treatment); *Fout v. State,* 575 N.E.2d 340, 342 (Ind.Ct. App.1991) (the jury could infer the defendant's subjective knowledge that he placed the defendant in a dangerous situation when the defendant was specifically informed of two conditions of child which required immediate medical attention).

ber 11, 1996, with a two-foot-long wooden rod, the defendant, a fifty-one-year-old woman, struck Emporia, a six-year-old girl, at least five times on the head and approximately fifty times on the shoulders, back, buttocks, arms, and legs. The defendant told the child to "die." Record at 658. With both of her hands, the defendant choked Emporia, causing the girl to gasp. Immediately after the beating, Emporia had visible bruises all over her body, and she acted differently. Her mouth was swollen, and her lips were purple. She could no longer walk after the beating. Her older sister had to help her take a bath, and then she had to help Emporia walk from the bathtub to where she would sleep that night.

The next morning Emporia was not breathing. The defendant wrapped Emporia in a sheet and bedspread and put her in the storage shed located outside the apartment, beside the patio. The defendant told Emporia's sister, Auinia, not to tell anyone or she would have to go to a foster home. For one month, neither the defendant nor Auinia mentioned Emporia's death to anyone. Finally, Auinia told their mother that Emporia was dead. On December 11, 1996, one month after the beating, paramedics responded to an emergency call and discovered Emporia's body in the shed.

In finding the defendant guilty of murder and neglect of a dependent, the jury could logically conclude that the defendant knowingly killed Emporia (i.e., that she was aware of the high probability that her repeated striking of Emporia on the head and body with the rod would result in death), and that the defendant knowingly placed Emporia in a situation that might endanger her life or health (i.e., that she was subjectively aware of a high probability that she placed Emporia in a dangerous situation by failing to seek medical attention when the average layperson would have recognized the danger and sought help). The jury was not required to find, and in fact did not find, that the defendant

knowingly caused Emporia's death under the murder charge and negligently caused her death under the neglect charge. Instead, with both of the charged offenses, the jury was required to find that the defendant acted knowingly. We hold, therefore, that the verdicts are not inconsistent.

### Confusing Instructions

The defendant argues that the trial court's instructions to the jury on the lesser-included offenses of involuntary manslaughter and reckless homicide were confusing, improper, and deficient.

During the conference regarding final instructions, the trial court and the parties extensively discussed the wording of the jury instructions explaining reckless homicide and involuntary manslaughter. The process resulted in the trial court giving the defendant's tendered instructions numbers 1 and 4 as modified, and the defense withdrawing its proposed instructions numbers 2, 3, and 5. After a recess to permit the instructions to be prepared in final form and reviewed by counsel, the court reconvened and asked if there were any objections. Each of the defendant's two lawyers separately declared that she had no objection. Because a defendant who fails to object to an instruction at trial waives any challenge to that instruction on appeal, T.R. 51(C); *Ford,* 704 N.E.2d at 461, we find that the defendant waived this claim.

Attempting to avoid procedural default, the defendant argues that the court's failure to explain the differences in the mens rea required for the various offenses constituted fundamental error. Citing *Clark v. State,* 668 N.E.2d 1206, 1210 (Ind.1996), and *Jackson v. State,* 575 N.E.2d 617, 621 (Ind.1991), the defendant urges that fundamental error occurs when a trial court improperly or insufficiently explains the differences in mens rea. Unlike the present case, both *Clark* and *Jackson* involved *attempted* murder, and neither addressed a claim of fundamental error for failing to

explain the difference in the mens rea required for various offenses. In *Clark*, this Court reversed an attempted murder conviction, holding that, because the trial court's instruction for attempted murder allowed conviction on "knowingly" and did not require "intent to kill," the trial court's correct statement in its general instructions could not cure this erroneous instruction. *Clark*, 668 N.E.2d at 1210. In *Jackson*, the defendant, who was convicted of attempted murder, challenged a jury instruction that the defendant claimed failed to require the finding of proof beyond a reasonable doubt of specific intent to commit murder, but this Court refused to find fundamental error. *Jackson*, 575 N.E.2d at 620–21.

■ This Court views the fundamental error exception to the waiver rule as an extremely narrow one, available only " 'when the record reveals clearly blatant violations of basic and elementary principles [of due process], and the harm or potential for harm [can]not be denied.' " *Ford*, 704 N.E.2d at 461 (quoting *Warriner*, 435 N.E.2d at 563). We find no fundamental error.

### Aggravating Factor

The defendant contends that the trial court used an improper aggravating factor to enhance the defendant's sentence for murder. Specifically, the defendant argues that the trial court erroneously found as an aggravating circumstance that the imposition of a sentence below the presumptive would depreciate the seriousness of the crime.

■ We have held that "the statutory aggravating factor 'imposition of a reduced sentence would depreciate the seriousness of the crime,' . . . only supports a refusal to reduce the presumptive sentence. The sentencing court should not use this statutory factor when considering whether defendant should receive less than the maximum enhanced sentence." *Archer v. State*, 689 N.E.2d 678, 684 (Ind.1997) (quoting IND.CODE § 35–38–1–7.1(b)(4)) (other citations omitted). *See also McCants v. State*, 686 N.E.2d 1281, 1286 (Ind.1997); *Bacher v. State*, 686 N.E.2d 791, 801 (Ind.1997). We agree that the trial court improperly used this factor as an aggravating circumstance.

■ However, a single aggravating circumstance is adequate to justify a sentence enhancement. *Gibson v. State*, 702 N.E.2d 707, 710 (Ind.1998); *Williams v. State*, 690 N.E.2d 162, 172 (Ind.1997). When a sentencing court improperly applies an aggravating circumstance, but other valid aggravating circumstances exist, a sentence enhancement may still be upheld. *Gibson*, 702 N.E.2d at 710; *Blanche v. State*, 690 N.E.2d 709, 715 (Ind.1998). In this case, the trial court found several other aggravating circumstances: the defendant's extensive history of criminal and delinquent activity; the defendant's need for correctional or rehabilitative treatment and the failure of previous rehabilitation; [10] the heinous nature and circumstances of the crime; and the victim's age of six years. *See* IND.CODE § 35–38–1–7.1. The trial court found two mitigating factors:

---

**10.** In her brief, the defendant does not challenge the trial court's use of the defendant's need for correctional and rehabilitative treatment as an aggravator. We have held that a trial court, in using this aggravator, must explain why the defendant is in need of treatment in a penal facility for a period longer than the presumptive sentence. *Berry v. State*, 703 N.E.2d 154, 158 (Ind.1998); *Taylor v. State*, 695 N.E.2d 117, 122 (Ind.1998); *Blanche*, 690 N.E.2d at 715. Although the trial court did not articulate any reasons, the court did state that "prior attempts at rehabil-

itation through probation and imprisonment in the past have all failed." Record at 1097. Any error by the court in failing to explain its reasons for finding that the defendant was in need of correctional and rehabilitative treatment that could best be provided by a period of incarceration in excess of the presumptive term is harmless considering the other aggravating factors, including the age of the victim and the defendant's lengthy history of criminal and delinquent activity. *See Blanche*, 690 N.E.2d at 715.

the defendant's remorse; and the defendant's mental health condition.

■ The trial court considered these factors and determined that the aggravating circumstances outweighed the mitigating circumstances. The trial court imposed a sentence of sixty-five years [11] and suspended five years, for a total executed term of sixty years.[12] Any error by the court in using the factor of depreciation of the seriousness of the crime as an aggravating circumstance is overcome because several valid aggravating circumstances were found, including the age of the victim, the heinous nature and circumstances of the crime, and the defendant's lengthy history of criminal and delinquent activity. *See Blanche,* 690 N.E.2d at 715; *Isaacs,* 673 N.E.2d at 765 n. 6 ("[T]he improper use of th[e depreciate the seriousness of the crime] aggravating circumstance does not invalidate a sentence enhancement where other valid aggravating circumstances are found."). We find no reversible error on this issue.

## Modification of the Defendant's Sentence

In its brief, the State contends that the trial court improperly granted the defendant's motion to correct her erroneous sentence. The State does not argue that the trial court or the defendant failed to follow the prescribed procedure. Rather, the State argues that the defendant's convictions and sentences for murder and class B felony neglect of a dependent do not violate the double jeopardy protection against multiple punishments for the same offense. Thus, the State claims that the trial court erroneously found that the defendant's convictions and sentences for murder and class B felony neglect of a dependent violated double jeopardy.

■ Indiana Code section 35–38–1–15 permits a defendant to file a motion to correct sentence. *See Reffett v. State,* 571 N.E.2d 1227, 1228–29 (Ind.1991). Under the statute, the trial court may correct an erroneous sentence. IND.CODE § 35–38–1–15. In *Jones v. State,* this Court held that a motion to correct sentence is appropriate where the sentence is erroneous on its face and that facial error occurs when the sentence violates express statutory authority. 544 N.E.2d 492, 496 (Ind.1989). If a sentence violating express statutory authority is ·facially erroneous, a sentence violating double jeopardy is also facially erroneous and may be attacked by a motion to correct erroneous sentence. *Cf. Reffett,* 571 N.E.2d at 1228–29 ("[A] sentence that violates the express terms of a plea agreement is . . . facially erroneous, and [it] may be attacked by a motion to correct erroneous sentence.").

■ A trial court's ruling upon a motion to correct sentence is subject to appeal by normal appellate procedures. *Thompson v. State,* 270 Ind. 677, 680, 389 N.E.2d 274, 276–77 (1979). While this Court will defer to the trial court's factual finding, reviewing only for abuse of discretion, we will review a trial court's legal conclusions under a *de novo* standard of review. *Cf. Champlain v. State,* 681 N.E.2d 696, 700 (Ind.1997).

In this case, the defendant filed a motion to correct sentence in writing and a supporting memorandum of law, specifically

---

11. At the time of the murder, the presumptive sentence for murder was fifty-five years, with not more than ten years added for aggravating circumstances. IND.CODE § 35–50–2–3.

12. For the neglect conviction, the trial court weighed the same aggravating and mitigating circumstances, sentenced the defendant to twenty years, and suspended two years, for a total executed sentence of eighteen years. The trial court ordered this sentence to run

concurrently with the sentence for murder. Because of double jeopardy considerations, the trial court later corrected the defendant's sentence for neglect, reducing the conviction from a class B felony to a class D felony and sentencing the defendant to three years with no years suspended and with the sentences running concurrently. *See infra* section discussing the modification of the defendant's sentence.

identifying a violation of the protections against double jeopardy found in the Fifth Amendment to the U.S. Constitution and Article I, Section 14 of the Indiana Constitution as the defect in the original sentence. After the State filed its response, the trial court granted the defendant's motion and corrected the defendant's conviction for class B felony neglect of a dependent, modifying the conviction to class D felony neglect and entering a new sentence of three years.

■ Recently, in *Richardson v. State,* 717 N.E.2d 32 (Ind.1999), we explained that two tests apply to determine whether multiple offenses constitute the same offense under the Indiana Double Jeopardy Clause:

[T]wo or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

*Id.* at 49. Under the statutory elements test, "[e]ach offense must contain at least one element which is separate and distinct from the other offense so that the same evidence is not necessary to convict for both offenses." *Id.* at 52. Murder requires a knowing or intentional killing, which is not required for class B felony neglect. Class B felony neglect requires knowingly or intentionally placing a dependent in a situation that may endanger the dependent's life or health, which is not required for murder. The offenses are not the same under the statutory elements test.

■ Even though these offenses are not the same offenses under the statutory elements test, we also apply the following actual evidence test:

[T]he actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.

*Id.* at 53. In *Richardson,* we noted that the trial court's instructions to the jury and the presentations of counsel to the jury can be helpful to the reviewing court in analyzing the actual evidence to determine whether the jury used the same evidence to establish multiple offenses. *Id.* at 54 n. 48. To convict the defendant of class B felony neglect, the State had to prove that the neglect resulted in serious bodily injury. IND.CODE § 35–46–1–4(a).

■ In this case, in the trial court's preliminary and final instructions to the jury, the court read the charges in the murder count, which alleged that the defendant's striking of Emporia caused Emporia to die. The court also read the charges in the neglect count, which alleged that the resulting serious bodily injury to Emporia was death. In its closing argument, the State focused the jury's attention on evidence that showed that the defendant caused Emporia's death when she severely beat her with a wooden rod, striking the six-year-old more than fifty times on the head, arms, back, and legs, and that the defendant knew there was a high probability that the actions she took would result in Emporia's death. The State also noted that, after the beating and the next morning when Emporia was unresponsive, the defendant failed to get medical attention for Emporia, even though she may have still been alive at that time.

Because the evidence offered to prove the resulting serious bodily injury was the same evidence offered to prove the knowing killing, there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish that the defendant

knowingly killed Emporia may also have been used to establish that the defendant's neglect resulted in serious bodily injury, an element required to prove class B felony neglect. The trial court did not err in correcting the defendant's sentence because of double jeopardy considerations.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.